# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JEANNE F. MARTELLI,

      Plaintiff,

v.                                                        Case No. 8:19-cv-0441-T-02SPF

THOMAS M. KNIGHT, in his capacity
as Sheriff of the SARASOTA COUNTY
SHERIFF'S DEPARTMENT, and DAVID
TUCK, in his individual capacity and as an
employee of the SARASOTA COUNTY
SHERIFF'S DEPARTMENT,

      Defendants.

_____/

## ORDER

      This matter comes to the Court on Defendants Thomas M. Knight and David

Tuck's Motion for Summary Judgment, Dkt. 40. Plaintiff Jeanne F. Martelli filed a

response. Dkt. 55. With the benefit of full briefing, the Court grants the Defendants'

Motion.

## STATEMENT OF THE FACTS

      The parties agree on the overarching facts of this case.[1] Late at night on

November 18, 2016, Plaintiff returned to the home she shared with William Tillis,

---

[1] In her Statement of Disputed Facts, Dkt. 57, takes issue with many of the facts set out in
Defendants' Statement of Undisputed Facts, Dkt. 41. But Plaintiff does not contest any of the
facts set out in this section of the Order. So, for the purposes of this section, the Court will cite to

her ex-boyfriend and current roommate. Dkt. 41 at 2–3. Plaintiff had been drinking and brought with her an unknown man. *Id.* at 3. Tillis was angered by this and made the man leave. *Id.* While it is disputed what happened immediately after that, it is undisputed that some time afterwards Plaintiff returned to her room, grabbed her 9mm handgun, loaded a magazine into the gun, and shot Tillis. *Id.* at 4; Dkt. 57 at 2–3 (describing Plaintiff's version of events between Tillis making the man leave and Plaintiff shooting Tillis)

Tillis and Plaintiff then both called 911 for medical help for Tillis. Dkt. 41 at 4. Plaintiff told the 911 operator that she "shot [Tillis]. Okay, because he was coming after me, and I'm done with him coming after me." Dkt. 57-2 at 33. When emergency services arrived, Tillis was rushed to the hospital and Plaintiff was detained by Sherriff's deputies. Dkt. 41 at 4–5. Defendant Tuck, the lead detective assigned by the Sarasota County Sherriff's Department, arrived shortly after this and began investigating the shooting. *Id.* Plaintiff maintained that she shot Tillis entirely in self-defense. *Id.* Tuck interviewed Plaintiff about the shooting but released her without making an arrest. *Id.* at 5–7.

Tuck then spent the next two weeks investigating the shooting and Plaintiff's self-defense argument. *Id.* at 7–9. Tuck interviewed various neighbors and friends

---

Defendants' Statement of Undisputed Facts, Dkt. 41, since these facts are, seemingly, undisputed.

about Tillis and Plaintiff. *Id.* Tuck reviewed evidence gathered at the scene and listened to the 911 tapes. *Id.* Tuck also unsuccessfully attempted to locate the man Plaintiff brought back to her home on the night of the shooting. *Id.*

After this investigation, Tuck typed up a one-page affidavit summary of the investigation and submitted it with an arrest warrant application for Plaintiff. *Id.* at 9–10. Florida Circuit Court Judge Debra Johnes Riva reviewed this application, found probable cause that Plaintiff committed Aggravated Battery with a Firearm, and ordered that Plaintiff arrested. *Id.* Plaintiff was arrested pursuant to this warrant on December 6, 2016. *Id.* at 10. After full discovery with adversarial fact uncovering by Plaintiff's criminal defense lawyer, the State Attorney entered a *nolle prosequi* in that prosecution on August 9, 2017. *Id.*

Plaintiff brings this suit against Sherriff Knight and Tuck under 42 U.S.C § 1983, for alleged violations of her Fourth and Fourteenth Amendment rights, and under Florida state tort law. Dkt. 20. Each of the counts in her Amended Complaint are based on claims of false arrest. *Id.* at 9–13. Defendants now move for summary judgment on these claims. Dkt. 40.

## LEGAL STANDARD

Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party and must resolve any reasonable doubts in the non-moving party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir.

2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

Defendants argue they are entitled to summary judgment on all of Plaintiff's claims for several reasons including qualified immunity. The thrust of Defendants' argument is that, even accepting all facts presented by Plaintiff, she is unable to show that she suffered injury because her arrest was not unlawful. This Court will first address this argument for Plaintiff's federal claims (Counts I and II) and then look to her state law claims (Counts III and IV).

A. <u>Federal Law Claims</u>

Tuck argues that he is entitled to qualified immunity from Plaintiff's federal claim. Qualified immunity protects a government official acting within his discretionary authority from civil lawsuits unless his conduct violates a statutory or constitutional right clearly established when the alleged violation occurred. *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

If an official is engaged in a discretionary function, the burden shifts to a plaintiff to overcome the official's qualified immunity by meeting a two-part test. *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005). First, she must show that the defendant violated a constitutional right. *Id.* This step requires a court to analyze the specific constitutional right at issue and decide as a matter of law if the defendant violated such a right. *Id.* at 1156–57. Second, if a violation occurred, she must then show that the right was clearly established at the time of the incident. *Id.* at 1156.

To begin, Tuck was engaged in discretionary functions. Discretionary functions are actions taken by a government official during "the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988). Plaintiff's allegations all involve actions taken by Tuck as a detective. So the burden then shifts to Plaintiff to show that Tuck violated a clearly established constitutional right.

Plaintiff contends that her arrest lacked probable cause because she was engaged in lawful self-defense. So, she argues, that her arrest was unlawful, and violated her Fourth Amendment rights. "An arrest made without probable cause is an unreasonable seizure" and violates the Fourth Amendment. *Paez v. Mulvey*, 915 F.3d 1276, 1285 (11th Cir. 2019). Tuck contends that obtaining a valid arrest warrant is sufficient for a valid and lawful arrest. While true, this argument

neglects to note that a valid arrest warrant must not only be facially valid but the uncontroverted facts must "show that the arrest warrant was executed in good faith *and with probable cause*." *Fullman v. Graddick*, 739 F.2d 553, 561 (11th Cir. 1984) (emphasis added).

Probable cause is established "when the facts and circumstances within the *officer's knowledge*, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003) (quoting *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003)). However, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010). "Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[ ] could have believed that probable cause existed to arrest.'" *Lee v. Ferraro*, 284 F.3d 1188, 1195 (citation omitted); *see also Brown*, 608 F.3d at 734. "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable cause exists." *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007).

Probable cause, arguable or not, is not a high bar to meet. *Kaley v. United States*, 571 U.S. 320, 338 (2014). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018) (citing *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13 (1983)). Far from "'requir[ing] convincing proof' that [an] offense was committed," probable cause is a flexible and fluid concept, that looks instead to the totality of the circumstances to determine the reasonableness of the officer's belief that a crime has been committed. *Manners v. Cannella*, 891 F.3d 959, 968 (11th Cir. 2018) (quoting *Bailey v. Bd. of Cty. Comm'rs of Alachua Cty.*, 956 F.2d 1112, 1120 (11th Cir. 1992)). Meaning that, "[t]he test for probable cause is not reducible to precise definition or quantification." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (internal quotation omitted).

Importantly, an affirmative defense to an alleged crime will not necessarily defeat probable cause. *Manners*, 891 F.3d at 971–72. Police officers aren't lawyers and are not expected to resolve legal questions or to weigh the viability of most affirmative defenses. *See Williams v. City of Albany*, 936 F.2d 1256, 1260 (11th Cir. 1991) ("Whether the statute of limitations bars a prosecution is a question of law. The officers properly deferred legal decisions to the district attorney."). Instead, the arresting officer should determine if "the totality of the circumstances

present a sufficient basis for believing that an offense has been committed." *Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002).

Beyond that, Florida's Stand Your Ground law, Florida Statutes §§ 776.012 and 776.032, adds another layer to the probable cause analysis. "[T]he Stand Your Ground law is intended to be an immunity from prosecution as opposed to just an affirmative defense[.]" *Bretherick v. State*, 170 So. 3d 766, 779 (Fla. 2015). Under Florida's Stand Your Ground law, "[a] person is justified in using . . . deadly force if he or she reasonably believes that using . . . such force is necessary to prevent imminent death or great bodily harm to himself or herself[.]" Fla. Stat. § 776.012(2). So an officer "may not arrest [a] person for using . . . force unless [the officer] determines that there is probable cause that the force that was used . . . was unlawful." *Id.* § 776.032(2). As noted by the Eleventh Circuit, "[s]ection 776.032(1) expressly grants defendants a substantive right to not be arrested, detained, charged, or prosecuted as a result of the use of legally justified force." *Davis v. City of Apopka*, 734 F. App'x 616, 622 (11th Cir. 2018) (quoting *Dennis v. State*, 51 So. 3d 456, 462 (Fla. 2010)).

That said, the Florida Supreme Court has acknowledged that while § 776.032(1) purports to grant immunity from arrest

in many situations, it would be impossible for law enforcement to secure a judicial immunity determination prior to arresting an individual suspected of killing or causing bodily harm to another (or

9

attempting to do so). The law is clear that we expect officers to temporarily detain a person encountered under circumstances creating a reasonable suspicion of criminal activity. § 901.151, Fla. Stat. (2017). Then, if there is probable cause to believe that the person committed a felony, law enforcement is authorized to immediately effectuate the arrest, under section 901.15, Florida Statutes (2017), and should clearly do so when there is probable cause to believe that a person has committed a serious crime of violence against another. Cf. § 907.041(4)(c)5., Fla. Stat. (2017) . . . . Probable cause to arrest for a crime of violence would include probable cause to believe that the suspect was not acting in self-defense; and, suspects will often claim self-defense even when the facts would not appear to support such a claim. This means that in most potential self-defense cases, a post-arrest and post-charging immunity determination, made when a defendant's counsel requests that determination, will be the best that we can do.

*Kumar v. Patel*, 227 So. 3d 557, 559–60 (Fla. 2017). Yet it is a different situation altogether when law enforcement waits to arrest someone and instead seeks a judicial determination of probable cause in a case where Stand Your Ground issues are potentially implicated—as was the case here. *See* Dkt. 57-1 at 68–69. Looking to Florida law, it appears in that situation the person would have immunity from arrest unless "there is probable cause that the force that was used . . . was unlawful." Fla. Stat. § 776.032(2).

Plaintiff's argument that her arrest warrant lacked probable cause centers on the allegation that Tuck failed to include certain facts in his warrant application. Plaintiff argues that these facts would have prevented the warrant judge from finding probable cause that her use of force was unlawful. And, since she was not arrested until after the judicial determination of probable cause, this would have

given her immunity under Florida's Stand Your Ground law from being arrested at all.

It is clear that an officer cannot 'cherry pick' those facts that support a probable cause determination and ignore those that are exculpatory. *See Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018). An arrest warrant may lack probable cause, and violate the Fourth Amendment, if a warrant application affidavit has intentional or reckless material misstatements or omissions. *Kelly v. Curtis*, 21 F.3d 1544, 1554 (11th Cir. 1994). Negligent misstatements or omissions, on the other hand, would not invalidate an arrest warrant. *Id.*

The Eleventh Circuit devised a two-part test to determine whether a misstatement in an officer's warrant affidavit amounts to a violation of the Fourth Amendment. *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). First, this Court asks "whether there was an intentional or reckless misstatement or omission." *Id.* Then, this Court "examine[s] the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included." *Id.*

At this stage in the proceedings this Court must view the evidence, and draw all factual inferences, in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). Since it is a disputed material fact whether Tuck omitted information and, if he did omit necessary

information, what his mindset was, this Court will take as true that Defendant omitted, either intentionally or with reckless disregard, the information Plaintiff alleges would have exculpated her. *See Paez*, 915 F.3d at 1287. The only remaining question, then, is whether the warrant application filed by Tuck would have still established probable cause to believe Plaintiff's use of force was unlawful if he had included the omitted information. If so, Tuck did not violate the Fourth Amendment and is entitled to qualified immunity.

As a first step, this Court must determine what information was omitted from the warrant application submitted by Tuck. Tuck's probable cause affidavit describes how both Plaintiff and Tillis called 911 after the shooting and Plaintiff

> stated to the 911 calltaker [sic] "I just shot my boyfriend because he was attacking me." [Tillis] stated to the 911 call taker "[Plaintiff] shot me, hurry' and 'get away from me." The 911 call taker also asked if [Tillis] knew why the defendant shot him and he stated "I don't know, hurry."

Dkt 57-2 at 46. Tuck also describes how a search of Plaintiff's residence found blood—presumably Tillis's—only in Tillis's bedroom with "[n]o other evidence . . . to believe a physical altercation occurred as [Plaintiff] described." *Id.*

Tuck goes on in the affidavit to detail interviews with Plaintiff and Tillis. Tuck notes that Plaintiff "related that she had an argument with [Tillis] which led to her being battered." *Id.* But, he observes that "an examination of [Plaintiff's] body did not corroborate these statements nor did the condition of her residence."

*Id.* The only other thing that Tuck records about this interview is that Plaintiff said "that after the battery she went into her room[,] obtained her handgun, loaded it, chambered a round, and shot [Tillis]." *Id.* Tuck then describes his interview with Tillis at Sarasota Memorial Hospital. In the interview Tillis denies being "involved in any altercation with the[Plaintiff]. He stated he was going back to his bedroom when he observed [Plaintiff] appear with a handgun and shoot him. [Tillis] denied battering [Plaintiff] at any time and was not sure why [she] shot him." *Id.*

But Tuck's investigative reports and interview transcripts—which were not attached to the warrant application—show details missing from Tuck's characterization in the affidavit. Despite presenting it as a he-said-she-said in the warrant application Tuck was able to corroborate many details of the events that took place before the shooting. Tillis admitted to Tuck that he angrily confronted Plaintiff and the man she brought back to her home before physically throwing the man out "by this ear." Dkts. 57-3 at 1. Plaintiff told Tuck her head hurt from being smashed into the ground and Tuck himself noticed a scratch on Plaintiff's arm, but this too was omitted. Dkt. 57-2 at 53. Similarly, Tuck omits certain details about the reliability of Tillis's statement—such as internally contradictory information and admissions by Tillis that his memory of the night was unclear—while including comments on the credibility of Plaintiff's statements. *Compare* Dkt. 57-3 at 6–8 (detailing a conversation between Tillis and Tuck where Tillis is confused

about many details of the night including about the time of the shooting) *with* Dkt.
57-2 at 46 ("However, an examination of the [Plaintiff's] body did not corroborate
[Plaintiff's] statements nor did the condition of the residence.").

Tuck also omits the context surrounding Plaintiff bringing the other man
home on the night of the shooting. Plaintiff and Tillis's relationship had recently
gotten rockier than usual. Plaintiff had been attempting to get Tillis to move out
but he was refusing to do so. Dkt. 57-3 at 45. And, despite attempts by Plaintiff to
end their relationship, Tillis continued to refer to Plaintiff as his "wife." *Id.* at 36–
37. Plaintiff had begun to warn Tillis that she intended to see other people since
they were no longer a couple. *Id.* at 63. The man that Plaintiff brought home that
night—who Tillis describes in his hospital interview as a "weirdo" with a "shitty
beard, shitty hair" and wearing "dumpy shit"—was the first man brought back to
her home since warning Tillis she intended to start dating. *Id.* at 1. There also was
increasing tension between Tillis and Plaintiff because Tillis was attempting to
maintain sobriety while Plaintiff was drinking again. *Id.* at 25.

Beyond that, the warrant application omits any mention of Tillis's history of
violence including violence against Plaintiff. During his interview with Plaintiff,
Tuck learned that Tillis "abus[ed] her pretty bad while they were living in Ft.
Meyers." Dkt. 57-2 at 50. Tuck had Plaintiff describe an incident where Tillis was
arrested for beating Plaintiff, dragging her to a car, and then throwing her out of

the moving car. *Id.* at 50–51; Dkt. 56 at 20. Plaintiff also told Tuck that there continued to be physical fights between Plaintiff and Tillis, including two times when she called the police. Dkt. 57-2 at 51. Tuck was able to confirm the existence of these 911 calls. *Id.* at 54. Moreover, Tuck discovered that Tillis had been previously charged for—though never convicted of—burglary, child abuse without harm, and domestic battery. *Id.* at 55. All of these details, too, were omitted from the warrant application affidavit.

Next, Plaintiff must establish that this omitted information would have negated the probable cause determination. This is a difficult burden for Plaintiff. The Eleventh Circuit recently noted that "if the [warrant application] (including the omitted information) would have demonstrated even arguable probable cause— that a reasonable officer could have believed an offense was committed—then the officers are entitled to qualified immunity." *Paez*, 915 F.3d at 1287. In this case the burden is slightly different because of Florida's Stand Your Ground law. The question in this case is whether the warrant application with the omitted information would have demonstrated even arguable probable cause that Plaintiff's use of force was unlawful.  Plaintiff is unable to meet this high burden.

Florida appellate courts have noted that "to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger

could be avoided only through the use of that force." *Garrett v. State*, 148 So. 3d

466, 468 (Fla. 1st DCA 2014); *see also Garcia v. State*, 286 So. 3d 348, 352 (Fla.

2d DCA 2019). So the circumstances that Plaintiff faced before she shot Tillis

were key to any determination of the lawfulness of her actions. Many of these

details were omitted by Tuck.

Plaintiff and Tillis have a, by their own admission, strange and, at times,

abusive relationship. Dkt. 57-2 at 50, 62. Tillis has, on one verifiable time and

several other alleged times, been physically violent with Plaintiff. This includes the

time that Tillis brutally beat Plaintiff in the face before throwing her from a

moving vehicle. Dkt. 56 at 20. Even before the events of that night, Plaintiff's

relationship with Tillis was already strained. Dkt. 57-2 at 52. They were sleeping

in separate rooms and Plaintiff was attempting to force Tillis to move out of the

home she owned. Dkt. 57-3 at 45. These facts set the scene for the confrontation

between Plaintiff and Tillis on the night of the shooting.

That night, Plaintiff brought home a man she met while out drinking. It is

undisputed that Plaintiff and the man were loud enough to wake up Tillis. Tillis

then angrily confronted them before throwing the man out "by the ear." Dkt. 57-2

at 62. Plaintiff then alleges that Tillis began to argue with and attack her. She

alleges that Tillis threw her to the ground and began to "smash" her head into the

ground. She alleges that she believed that Tillis was out of control and would kill

her. Dkt. 57-3 at 63. She then runs to her room and gets her gun. It is unclear what Plaintiff's intentions were at this point but she returned to the hallway and ran back into Tillis. It was in this small hallway area that Plaintiff shot Tillis. These allegations are contradicted by Tillis.

During his interview at the hospital, Tillis told Tuck that he could not remember if he got into an argument with Plaintiff that day. Dkt. 57-2 at 102. He told Tuck that after he threw the man out "by his ear" there was no argument or confrontation between him and Plaintiff. Dkt. 57-3 at 2–3. He then said that he was walking back to his room when Plaintiff entered the hallway and shot him in the abdomen. *Id.*

That all said, the facts that Tuck discovered in his investigation, taken in their entirety, are unclear. It is agreed that Tillis was angry and physically attacked the man Plaintiff had brought home. It is also agreed that Plaintiff went to her bedroom, loaded a magazine into her handgun, chambered a round, returned to the narrow hallway, and shot Tillis. What happened between these two agreed bookends is disputed. In the light most favorable to Plaintiff, she was violently attacked by her estranged former-boyfriend who had a history of violence against her and who was angry with her after she returned home drunk and with a strange man. But, even accepting this as true, a reasonable judge could have still found probable cause that her use of force was unlawful.

17

Again, the standard here is high. Plaintiff must show that the warrant application with the omitted information would not have demonstrated even arguable probable cause that Plaintiff's use of force was unlawful. While many of the facts support Plaintiff's version of events and paint a picture of justified self-defense, there is enough ambiguity even in Plaintiff's own version of the facts to support arguable probable cause that her use of force was unlawful.

Accepting that Tillis attacked Plaintiff and that she credibly feared for her life, she still had the time to go to her bedroom, retrieve the gun, and return to the hallway to shoot Tillis as he was either retreating to his bedroom or following Plaintiff to continue the attack. Even if ultimately her decision to shoot Tillis in the hallway was perfectly reasonable, with the information Tuck was able to discover there is a reasonable argument that the circumstances changed when she went to her bedroom. It is a reasonable conclusion to draw that the danger she faced in the hallway was no longer "so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of that force." *Garrett*, 148 So. 3d at 468.

As noted by the Florida Supreme Court in *Kumar v. Patel*, Florida's Stand Your Ground law presents an interesting predicament. On the one hand, if law enforcement knows a suspect shot someone, but sees a credible Stand Your Ground argument, they may arrest that person and determine immunity from

prosecution at a hearing post-arrest. *Kumar*, 227 So. 3d at 559–60. On the other hand, if law enforcement investigates the shooting and seeks an arrest warrant, immunity from arrest is determined in an ex parte proceeding with no defense argument, no ability to judge the credibility of witnesses, and no substantive presentation of evidence.[2] *See Id.* And in many cases—this one seemingly included—the entirety of the evidence presented to the judge deciding probable cause is a single-page affidavit sworn out by the detective assigned to the case. So while Florida's Stand Your Ground law purports to grant immunity from arrest, the bounds of that immunity are unclear.

In that regard, Plaintiff may well have been entitled to Stand Your Ground immunity from arrest for the shooting. In fact, after Plaintiff's criminal defense attorney engaged in discovery in her the criminal matter the State Attorney entered a *nolle prosequi* in that prosecution. But that is not the issue presented in this case. Here, this Court must determine whether the information omitted from the probable cause affidavit that would have created a warrant application where there was not even arguable probable cause. While many details relevant to the situation that faced Plaintiff on the night of the shooting were—seemingly improperly— omitted, taking all of the information found by Tuck there is still reasonably

---

[2] However, to be clear, in this example too an arrested individual would have the opportunity for a full hearing, while represented by legal counsel, to determine immunity from *prosecution* under Stand Your Ground.

arguable probable cause that Plaintiff's shooting Tillis in the stomach was unlawful. So Plaintiff is unable to meet the second-prong of the Eleventh Circuit's test and there was arguable probable cause to arrest Plaintiff. *Paez*, 915 F.3d at 1287. Since Plaintiff is unable to show her arrest was unlawful Tuck is entitled to summary judgment on Plaintiff's section 1983 claim in Count II of the Amended Complaint.

As for the section 1983 claim in Count I against Knight in his capacity as Sheriff of the Sarasota County Sheriff's Department, Knight argues that he is entitled to summary judgment for several reasons. But, in her Response in opposition to this Motion, Plaintiff fails to respond to any of Defendant's arguments for summary judgment on Count I.

The Eleventh Circuit has repeatedly stated that failure to defend a claim on summary judgment results in the claim being abandoned. *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 972 n.36 (11th Cir. 2008) ("[Plaintiff] did not defend the claim on summary judgment; he thus abandoned it."). "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. . . . Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resolution*

*Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). The Court finds that Plaintiff has abandoned Count I. So summary judgment on Count I is granted.

B. <u>State Law Claims</u>

With summary judgment granted to Defendants on the federal claims, all that remains are Plaintiff's state False Arrest claims, Counts III and IV. But, if a district court "has dismissed all claims over which it ha[d] original jurisdiction," 28 U.S.C. § 1367(c)(3) provides that the court may decline supplemental jurisdiction over any remaining state law claims. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendent state claims rests within the discretion of the district court."). The Supreme Court notes that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Melion Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Similarly, the Eleventh Circuit "encourage[s] district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." *Raney*, 370 F.3d at 1089.

These false arrest claims center on Florida's Stand Your Ground. In the interest of comity to Florida state courts to interpret these unique issues, Plaintiff's

False Arrest claims are best heard in state court.[3] Finding no reason why the remaining state law claims should proceed in this forum, this Court declines to exercise supplemental jurisdiction. The state law claims (Counts III and IV) are dismissed without prejudice. *See Ingram v. Sch. Bd. of Miami-Dade Cnty.*, 167 F. App'x. 107, 109 (11th Cir. 2006) ("When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court."). As to these state claims, this Court tolls the statute of limitations for sixty days.

---

[3] The statute of limitations on these claims has not yet run and Plaintiff is still free to pursue these state law remedies in state court. *See Ervans v. City of Venice*, 169 So. 3d 267, 268 (Fla. 2d DCA 2015) (citing Fla. Stat. § 95.11(3)(o)).

## Conclusion

The Court grants Defendants' Motion for Summary Judgment, Dkt. 40, for Counts I (Section 1983 False Arrest claim against Knight) and II (Section 1983 False Arrest claim against Tuck). Counts III (state law False Arrest claim against Knight) and IV (state law False Arrest claim against Tuck) are dismissed, without prejudice. The Clerk is directed to enter judgment consistent with this Order, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Tampa, Florida, on June 23, 2020.

/s/ William F. Jung
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record